JOSÉ E. CARRERO GONZÁLEZ, demandante y apelado, *v.* VIRGINIA DEL CASTILLO SANTOS, demandada y apelante.

No. 5036.—*Sometido:* Noviembre 21, 1929.  *Resuelto:* Julio 24, 1930.

*F. Piñeiro,* abogado de la apelante; *González Fagundo & González Jr.,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR HUTCHISON, emitió la opinión del tribunal.

La demandada en un pleito de divorcio apela de una orden declarando sin lugar una moción de traslado.

En la demanda se alega que el actor y su esposa son ciudadanos americanos, residentes en Puerto Rico por más de cinco años inmediatamente anteriores a la fecha del comienzo de la acción.  No hay ninguna otra alegación respecto a la residencia de cualquiera de las partes.

La moción y las declaraciones juradas revelan que la demandada nació en Rincón, en el distrito de Aguadilla, donde ha vivido desde entonces; que es ahora, y lo ha sido por más de diez años, maestra en las escuelas públicas de Rincón; que ella y su esposo contrajeron matrimonio en Rincón, y vivieron allí hasta enero de 1929, cuando el esposo —un torrero—fué trasladado a Culebra; que la demandada, a virtud de su contrato con el Departamento de Instrucción, estaba obligada a dar fin al año escolar, y que su esposo no la invitó a acompañarle a Culebra, ni la ha invitado a unirse a él.  No hubo declaraciones juradas para contrarrestar las que hemos mencionado.

La demanda fué radicada en mayo de 1929, en la Corte

de Distrito de Humacao. Nada hay que indique un cambio de domicilio, a no ser que el esposo fué trasladado de un faro a otro.

El demandante alega como causa de divorcio que hacía más de un año con anterioridad a la radicación de la demanda, la esposa, voluntariamente y sin el consentimiento del demandante, lo había desertado y abandonado, sin razón alguna para ello, y desde entonces, sin el consentimiento de él y contra su voluntad, ella ha vivido separada de él con el propósito firme de no volver a vivir con él. La demanda no está jurada.

La demandada en su *affidavit* de méritos sostiene que la alegación relativa a deserción y abandono es falsa, que la demandada en ningún momento ha dejado de cumplir los deberes conyugales para con el demandante, y que la demanda de divorcio es una verdadera sorpresa para ella: Manifiesta además que no fué la intención de su esposo que ella violara su contrato con el Departamento de Instrucción, y que aquél radicó la demanda en el distrito de Humacao con el fin de privarla de la oportunidad de defenderse

Que marido y mujer vivieron juntos en Rincón hasta el momento de la partida del consorte para Culebra, queda demostrado por tres declaraciones juradas. La aseveración de la esposa de que su marido no la invitó a acompañarle a Culebra está corroborada por el hecho de que la demanda de divorcio fué entablada poco después de él haber llegado allí, basada en supuestas causas preexistentes.

En ausencia de contradeclaraciones juradas, los *affidavits* en apoyo de la moción deben aceptarse como ciertos a fin de determinar la cuestión de jurisdicción. El caso así presentado es el de una esposa abandonada por su marido, más bien que el de un esposo abandonado por su mujer.

El sitio en que una persona realmente vive se presume que es *prima facie* su domicilio legal, pero la verdadera residencia es meramente una circunstancia, y la presunción que surge en virtud de la misma no es concluyente. Una vez

obtenido o adquirido un domicilio, se presume que continúa, y a la parte que alega que ha habido un cambio, incumbe probarlo. 19 C. J. 431, sección 66.

Cuando no hay cuestión de jurisdicción o de traslado envuelta para los fines del divorcio, no faltan autoridades que sostienen, especialmente entre las decisiones antiguas, que ''la residencia en cualquier otro lugar puede destruir la presunción relativa a la continuación de la residencia original, particularmente cuando ella es de tal duración o está caracterizada por circunstancias tales que indican la intención de adoptar la nueva localidad como domicilio.'' 19 C. J. 432, 433, sección 67. Aun en tales casos, ''la mera residencia en cualquier otro sitio no destruirá la presunción en cuanto a la continuación de la misma, a menos que sea inconsistente con la intención de regresar al domicilio original.'' Id., id. Fué en el caso de *Williamson* v. *Osenton*, 232 U. S. 619, 624, que la Corte Suprema de los Estados Unidos, por voz del Juez Asociado Sr. Holmes, dijo en 1914:

''El hecho esencial que transmuta un cambio de residencia en uno de domicilio, es la ausencia de cualquier intención de vivir en cualquier otro sitio—Story sobre Derecho Internacional Privado, sección 43—, o, como lo expresa Mr. Dicey en su admirable libro, 'la ausencia de una intención de momento de residir permanente o indefinidamente en el nuevo lugar.' Derecho Internacional Privado, segunda edición, página 111.''

En el presente caso el traslado de un faro a otro no era ''inconsistente con la intención de regresar al domicilio original.'' *Carpenter* v. *Carpenter*, 2 Pac. 122. No tenemos motivo alguno para asumir que el traslado llevaba consigo un aumento de salario, o que las condiciones de vida en la isla de Culebra son mejores que en Rincón. Si tomamos conocimiento judicial del tamaño, situación geográfica, número de habitantes y características generales de la isla de Culebra, existen menos motivos para creer que aun un torrero avezado optaría por permanecer allí más de lo necesario. No existe base satisfactoria para la inferencia del

*animus manendi*, que es lo que "transmuta un cambio de residencia en uno de domicilio."

El traslado oficial, sin más, no efectuó un cambio del domicilio del marido. Ni mucho menos varió el domicilio conyugal. "Para los fines del divorcio, el domicilio no es un favorito de la ley." *Harrison* v. *Harrison*, 84 Atl. 57, 59. El domicilio conyugal, una vez establecido, "continúa hasta que se adquiera uno nuevo; no se puede adquirir uno nuevo, aun implícitamente, mediante el abandono de un cónyuge al otro con la intención clara y decidida de romper los lazos matrimoniales, aunque tal abandono esté justificado." 19 C. J. , sección 36, páginas 26 y 27.

Desde cualquier ángulo que se observe el caso, el esposo no podía llevarse consigo el domicilio de la esposa en forma tal que la privara de su derecho al traslado del pleito.

En *Champon* v. *Champon*, 40 La. Ann. 28, 31, 32, el tribunal dijo:

"El verdadero significado de este aforismo, relativo a ser el domicilio de la esposa el del marido, es que el domicilio de la esposa es el del esposo al tiempo de contraer matrimonio, o el que él provea para sí y su consorte después de celebradas las nupcias, y al que, aunque él pueda cambiarlo a voluntad, la esposa sea llevada o invitada, o, por lo menos, del cual ella tenga conocimiento y al que ella pueda ir y permanecer en él a su antojo."

En *Harteau* v. *Harteau*, caso resuelto en 1883 que fija el derrotero a seguir por futuras decisiones, la Corte Suprema de Massachusetts, por voz del Juez Presidente Sr. Shaw, expresó un pensamiento que ha seguido los pasos del progreso a través de un siglo de opiniones judiciales conservadoras. Fué el siguiente:

"Es probablemente un punto de vista más justo considerar que la máxima se funda en la teoría de identidad de persona y de intereses existente entre marido y mujer, según lo establecen la ley y la presunción de que, dada la naturaleza de esas relaciones, el hogar de uno es el hogar de la otra, y su intención es promover, fortalecer y garantizar los intereses de los cónyuges, mientras perduran las re-

laciones que ordinariamente existen cuando hay unión y armonía. Pero la ley reconoce que una esposa tiene existencia separada, intereses separados y derechos separados en aquellos casos en que el propósito expreso de todos los procedimientos es demostrar que las relaciones mismas deben disolverse o modificarse en forma tal que se establezcan intereses separados, y especialmente un domicilio y hogar distintos, conceptuándose el albergue y la comida—la parte en representación del todo—como expresivos de la idea del hogar. De lo contrario, las partes estarían sobre bases muy desiguales, pudiendo el marido cambiar su domicilio cuando le plazca, mas no así la esposa.

"El marido puede privar a la mujer de los medios de hacer valer sus derechos, y, en efecto, puede privarla de los derechos mismos y de la protección de las leyes del estado, al par que la mala conducta de él puede darle a ella el derecho de libertarse de él a causa de su mala conducta para con ella. Dean v. Richmond, 5 Pick. 461; Barber v. Root, 10 Mass. R. 260."

Unos treinta años más tarde, en el caso de *Colvin* v. *Reed,* 55 Pa. St. Rep. 375, 379, dijo el Tribunal Supremo de Pennsylvania:

". . . La unidad de persona creada por el matrimonio es una ficción legal que debe seguirse para todos los fines provechosos y justos, y no debe ser usada para destruir los derechos de uno u otro consorte, en contra de los principios de la justicia natural, en procedimientos que, por su naturaleza, los convierten en partes contrarias.

"Fué necesario el consentimiento mutuo para establecer la relación de que emana esta unidad; y la misma ley exige que sean considerados separadamente en su condición natural cuando cualquiera de ellos procede contra el otro en forma tal que destruya esta relación. Tal es el efecto necesario de ser partes adversas en el mismo procedimiento."

Más adelante, hallamos en la misma opinión lo que sigue:

". . . En un procedimiento para disolver un matrimonio las partes se sitúan sobre el mismo nivel de derechos. Cuando la parte agraviada busca un nuevo domicilio y los domicilios respectivos son, por tanto, distintos, no existe razón mayor para que el nuevo domicilio del esposo prevalezca sobre el de la esposa que la que hay para que el de la mujer prevalezca sobre el del marido. En ese sentido, la justicia exige que ninguno de ellos lleve al otro al regazo de una jurisdicción extraña.

"Si una esposa que disfruta de las comodidades del hogar, de amigos y refinamiento, se negare a seguir el antojo y el capricho de su esposo de marcharse a las selvas del oeste o hacer frente a los peligros y vicisitudes de un viaje a las minas de California, ¿bajo qué principio del derecho natural que regula la ley interestadual puede la nueva residencia del esposo variar el domicilio de su consorte?"

El presente status de la ley queda indicado por el siguiente extracto del caso *Buchholz* v. *Buchholz,* Ann. Cas. 1912-D 395, 396:

"Cuando el marido ha abandonado a la mujer, o cuando ha habido un abandono mutuo de las relaciones matrimoniales en forma tal que los fines del enlace quedan destruídos, el fundamento de la regla de que el marido puede fijar el domicilio de la familia cesa, y la regla cesa también, estando la mujer entonces en libertad de establecer un domicilio separado para todos los fines. Gordon v. Yost, 140 Fed. 79; Watertown v. Greaves, 112 Fed. 183, 50 C.C.A. 172, 56 L.R.A. 865; Shute v. Sargent, 67 N.H. 305, 36 Atl. 282; Matter of Florance, 54 Hun. 328, 7 N.Y.S. 578; 84 Am. St. Rep. 33, 34, nota 8."

La sabiduría de este parecer está sostenida por las autoridades revisadas en la opinión, por la nota que aparece al pie de la misma, por los casos citados, y por la Corte Suprema de los Estados Unidos en *Williamson* v. *Osenton, supra,* en el cual se dijo que:

". . . La única razón que podría aducirse para no reconocer el hecho del cambio efectuado por el demandante, si es que está justificada, es la ficción, que actualmente está desapareciendo, de la identidad de persona. Pero de no prevalecer esa ficción sobre el hecho de la relación por la cual fué creada, no hay razón alguna en el mundo para dársele efecto en torno a cualquier otro hecho. Cualquiera que sea la regla en Inglaterra, el que en este país una mujer en las circunstancias de la demandante en este caso pueda obtener un domicilio distinto del de su esposo para los fines del divorcio, no ha sido disputado ni está sujeto a controversia. Haddock v. Haddock, 201 U.S. 562, 571, 572. Ella puede hacer esto no por necesidad, sino porque le plazca, según revelan los casos, y el cambio que es válido con respecto al esposo debe serlo con respecto a todo el mundo. En las decisiones posteriores, el derecho a cambiar el domi-

cilio y el efecto del cambio quedan establecidos en términos absolutos. Gordon v. Yost, 140 Fed. Rep. 79: Watertown v. Greaves, 112 Fed. Rep. 183; Shute v. Sargent, 78 N.H. 305; Buchholz v. Buchholz, 115 Pac. Rep. 88. Véase Haddock v. Haddock, sup., Barber v. Barber, 21 How. 582, 588, 597, 598.''

A menos que en Puerto Rico deba prevalecer una regla distinta, de lo que antecede se desprende que cuando el demandante en el presente caso abandonó a su esposa, se fué para Culebra y entabló demanda de divorcio en Humacao, anuló su derecho a fijar el domicilio conyugal, y la demandada quedó en libertad de retener como suyo el domicilio matrimonial ya establecido en Rincón, teniendo derecho, por tanto, a solicitar el traslado del caso.

En *De la Viña* v. *Villareal y Geopano*, 41 Jur. Fil. 14, el Tribunal Supremo de Filipinas unánimemente fué del criterio de que no existe diferencia fundamental entre la doctrina americana y el derecho español sobre la materia. La forma en que se discute y resuelve este aspecto de la cuestión indica que no hubo duda alguna en la mente de ninguno de los miembros de aquella corte. La parte pertinente de la opinión lee como sigue:

''Consultando las autoridades españolas, vemos que convienen con las americanas en sostener que la máxima o regla de que el domicilio de la esposa sigue al del marido no es absoluta. Scaevola, comentando el artículo 40 del Código Civil (que es la única disposición o autoridad legal en que se funda el solicitante en este asunto), dice:

'' 'Si bien el artículo 64 de dicha ley (Ley de Enjuiciamiento Civil) prescribe que el domicilio de la mujer casada, no separada legalmente, sea el de su marido, cuando el consentimiento tácito de éste y otras circunstancias del caso lo justifiquen, es de estimar, a los efectos de la competencia, como domicilio de aquélla el de su habitual residencia, donde, con arreglo al citado artículo 63, pueda ejercitar su derecho.' (Scaevola, Código Civil, págs. 354, 355.)

''Manresa, comentando el mismo artículo (art. 40), dice:

'' 'El domicilio de las mujeres casadas, que no estén separadas legalmente de sus maridos, será el que éstos tengan. Este principio, sostenido por el Tribunal Supremo en multitud de fallos, *fué rectificado* en un caso especial por la sentencia de 17 de junio de 1887, y

conformes con ésta se han dictado después otras tres, en 13, 23 y 28 de octubre de 1899, en todas las cuales se declara que cuando las mujeres casadas, y lo mismo los hijos sujetos a la patria potestad, vivan con aquiescencia de sus maridos o padres, en lugar distinto que éstos, tienen domicilio propio e independiente, que es al que debe atenderse para determinar la competencia en casos de alimentos provisionales, depósito de personas, etc.' (1 Manresa, 223.)''

En la Enciclopedia Jurídica Española, tomo XII, pág. 438, hallamos lo siguiente:

''En España hemos entendido que bastaba la separación de hecho, cuando resulta consentida por el marido a diferencia de lo que ocurre en Francia, Bélgica, etc., donde se ha resuelto la necesaria concurrencia de la separación de hecho y de derecho tanto que, en un caso en que la mujer demandada prestaba servicios domésticos en casa de un tercero, domiciliado en distinta población, prevaleció el fuero del marido. Cuando éste abandona a su mujer, habrá que atenerse al último domicilio conyugal.''

Manresa, en el primer tomo de sus Comentarios al Código de Enjuiciamiento Civil Español, págs. 225, 226 y 227, dice:

''Por la residencia en un lugar con casa abierta y ánimo de permanecer en él, se adquiere el domicilio: este ánimo o intención, cuando no consta por declaración del interesado o por otros actos positivos, se deduce del hecho de tener o haber adquirido bienes en aquel pueblo, de haber trasladado a él su familia e intereses muebles, de haberle hecho asiento de la profesión, granjerías o negocios respectivos; en suma, de cualquier hecho que indique que el interesado ha establecido definitivamente su residencia en aquel punto, abandonando la que antes tenía en otro lugar. . .

''Ahora bien ¿qué se entenderá por domicilio para los efectos del fuero? Indudablemente el lugar en que tiene su residencia habitual el demandado, con casa abierta, ejerciendo allí su profesión, arte u oficio, u otra cualquiera manera de vivir conocida, o manteniéndose con el producto de sus bienes. La residencia en un lugar con estas circunstancias por espacio de seis meses a lo menos es bastante, según el espíritu del artículo 16 de la citada ley municipal, para que se repute o considere como el domicilio del demandado, ante cuyo juez podrá serlo en los casos en que se siga el fuero del domicilio. Sin embargo, téngase presente que no se pierde el domicilio por la au-

sencia temporal del lugar en que se vive, sin ánimo expreso o presunto de abandonarlo: es necesario que al hecho se reúna la voluntad expresa o presunta. El que tiene la vecindad legal en un punto, y reside temporalmente en otro, si en aquél conserva su casa abierta y sufre las cargas del vecino, no podrá considerarse como domiciliado en el segundo: mas si en el primer punto no conserva su casa abierta ni sufre las cargas vecinales, es claro que de hecho habrá perdido la vecindad, y su domicilio será el pueblo en que reside: la ley no debe proteger los fraudes a que suele dar lugar el residir en un punto aparentando ser vecino de otro.''

De forma que en España, al igual que en los Estados Unidos, el *animus manendi* es un elemento esencial en la adquisición de un nuevo domicilio. El demandante en el presente caso dejó a su familia, presuntivamente en la misma casa en que había vivido con su esposa e hija hasta el momento en que fué trasladado a Culebra. No se demuestra que él haya adquirido ni que posea bienes en Culebra. Fuera del hecho de que el demandante es un empleado del gobierno, y de ser distintas las circunstancias concurrentes, al tiempo de radicar su demanda el demandante no había vivido en Culebra suficiente tiempo para siquiera establecer un domicilio presuntivo, de acuerdo con la Ley Municipal española. Desde el punto de vista del derecho español, así como del de las decisiones americanas, no hubo cambio de domicilio.

El artículo 40 del Código Civil vigente en Puerto Rico con anterioridad a la revisión de 1902, lee en parte como sigue:

"Para el ejercicio de los derechos y el cumplimiento de las obligaciones civiles, el domicilio de las personas naturales es el lugar de su residencia habitual; y, en su caso, el que determine la ley de Enjuiciamiento civil.''

El artículo 64 del antiguo Código de Enjuiciamiento Civil disponía lo siguiente:

"El domicilio de las mujeres casadas que no estén separadas legalmente de sus maridos, será el que éstos tengan. . .''

El artículo 1879 proveía, entre otras cosas, que:

"Podrá decretarse el depósito:
"1º. De mujer casada que se proponga intentar, o haya intentado, demanda de divorcio, o querella de amancebamiento contra su marido, o la acción de nulidad del matrimonio.
"2º. De mujer casada contra la cual haya intentado su marido demanda de divorcio, o querella de adulterio, o la acción de nulidad del matrimonio."

Los artículos sucesivos prescribían los detalles del procedimiento a seguir en relación con la solicitud y preparación de semejantes decretos. Fué en un procedimiento de esta clase que la Corte Suprema de España en su decisión de 17 de junio de 1887, 62 Jur. Civ. 25, resolvió:

". . . si bien en el art. 64 de dicha ley se prescribe que el domicilio de la mujer casada sea el de su marido, no separada legalmente, en el caso presente, atendidas las circunstancias, el consentimiento del marido permitiéndole viviese y residiese en Sevilla desde que se casaron en 25 de septiembre de 1866, pues no consta que él se opusiere a ello, demuestran que el domicilio de la misma era Sevilla, donde con arreglo a la disposición del art. 63 ha podido ejercitar su derecho."

En un procedimiento similar relativo a la custodia de menores, la misma corte, en una decisión de octubre 23, 1899, 88 Jur. Civ. 153, dijo:

". . . si bien es cierto que los hijos constituídos bajo la potestad de su padre se reputan domiciliados con éste, esa regla general carece de aplicación al caso en que sea el mismo padre quien reclame el fuero de su domicilio contra el que hubieren ganado los hijos residiendo con autorización expresa de su madre, porque entonces el padre, que ha contribuído a crear tal situación, está obligado a reconocerla, sometiéndose al fuero del domicilio de los hijos que hayan de ser depositados, como para casos análogos, o sea para el caso del depósito de las mujeres casadas, tiene repetidamente declarado este Tribunal Supremo."

El artículo 40 del antiguo Código Civil fué omitido en la revisión de 1902 y el antiguo Código de Enjuiciamiento Civil fué substituído por el de 1904. El artículo 11 del

actual Código Político, informado por una comisión codificadora conjuntamente con el Código Civil Revisado, y adoptado simultáneamente con el mismo por la Legislatura Insular en 1902, contiene hoy en día la única disposición estatutoria que trata directamente la cuestión de domicilio. Dice así:

"Toda persona tiene domicilio legal. Para determinar el lugar de domicilio se observarán las siguientes reglas:

"1. Es el lugar donde reside habitualmente una persona, cuando no es llamada a otra parte para trabajar u otro objeto temporal, y al cual retorna en las épocas de descanso.

"2. Sólo puede haber un domicilio.

"3. Para los efectos de la competencia de los tribunales, no puede perderse un domicilio hasta adquirirse otro.

"4. Es domicilio de los hijos no emancipados el domicilio de su padre, y después de la muerte de éste, el de su madre.

"5. El domicilio de la esposa se presume ser el del marido.

"6. El domicilio de un menor no casado, sujeto a tutela, es el de su tutor.

"7. El domicilio puede cambiarse sólo mediante la unión del acto y del intento."

Los artículos 156, 157 y 158 del Código Civil Revisado leen como sigue:

"Artículo 156. Los cónyuges están obligados a vivir juntos, guardarse fidelidad y socorrerse mutuamente.

"Artículo 157. El marido debe proteger a la mujer y satisfacer sus necesidades en proporción a su condición y medios de fortuna.

"Artículo 158. La mujer está obligada a obedecer y seguir a su marido dondequiera que fije su residencia."

Ninguna parte de cualquiera de estos artículos puede ser removida del sitio en que se halla y considerarse aisladamente. Los tres artículos deben ser interpretados conjuntamente; cada uno a la luz de los otros, y todos en armonía con el artículo 11 del Código Político, y a la luz de la tendencia general de la legislación moderna en esta Isla y en cualquier estado de la Unión hacia la emancipación de la mujer casada. En *Shute* v. *Sargent,* 36 Atl. 282, del cual se copia con aprobación en *Buchholz* v. *Buchholz, supra,* y en

la nota que consta al pie, y citado también en *Williamson* v. *Osenton*, la Corte Suprema de New Hampshire dijo:

"La máxima de que el domicilio de la mujer sigue al del marido 'resulta del principio general de que una persona que se halla bajo el poder y autoridad de otra no tiene el derecho a elegir un domicilio.' Story sobre Derecho Internacional Privado, sec. 46. 'Mediante el matrimonio, el marido y la mujer se convierten en una persona ante los ojos de la ley,—es decir, la existencia legal de la esposa queda suspendida durante el matrimonio o por lo menos se incorpora y consolida con la del marido, bajo cuyo dominio, protección y amparo ella lo realiza todo.' 1 Bl. Com. 442. Siendo tal el status de la esposa de acuerdo con el derecho común, su domicilio necesariamente seguía al del esposo, y la máxima se aplicaba sin límite o restricción alguna. Pero la teoría del matrimonio del derecho común ha perdido terreno en todas partes, y especialmente en este estado, donde la ley durante largo tiempo ha reconocido a la mujer una existencia distinta, derechos distintos, e intereses distintos. Con respecto a los deberes y obligaciones que surgen del contrato matrimonial y que constituyen su objeto, el marido y la mujer continúan siendo y deben continuar siéndolo, una unidad legal; pero la antigua unidad ha sido quebrada a tal extremo, y la teoría de la servidumbre de la esposa suplantada por la teoría de igualdad establecida por la legislación y las decisiones del último medio siglo, que hoy en día ella está situada, casi sin excepción, al mismo nivel que el esposo en lo referente a bienes, actos torticeros, contratos y derechos civiles. Pub. St. c. 176; ib. c. 90, s. 9; Seaver v. Adams, 66 N.H. 142, 143, y las autoridades allí citadas. Y toda vez que la ley la coloca en situación similar en forma tal que actualmente el marido no tiene más poder y autoridad sobre ella que los que ella tiene sobre él, no parece existir razón alguna por la cual no pueda adquirir un domicilio distinto para todos los fines conocidos por la ley. Si bien hay ciertos casos excepcionales en que para ciertos fines tal vez podría resolverse correctamente lo contrario, sin embargo, no habría en esta jurisdicción fundamento alguno para resolver que cuando el esposo ha perdido sus derechos conyugales a causa de su mala conducta, la esposa no pueda adquirir un domicilio distinto y ejercer los derechos y deberes correspondientes a la ciudadanía de que ha sido investida la mujer casada. Resolver lo contrario no sólo quebrantaría la línea de consistencia y de progreso que paulatinamente ha ido avanzando hasta que las antiguas distinciones entre ambos sexos, que fueron adaptadas a una situación que ha dejado de existir y que nunca po-

drá volver, han sido eliminadas en su mayoría, sino que subvertiría el derecho estatutorio de votar y de ser electo para un cargo de carácter educativo que la esposa posee en la actualidad, pues obligaría a la cónyuge inocente a residir y a constituir su hogar en cualquier precinto electoral en que el esposo culpable decidiera fijar su domicilio, o verse privada de la franquicia electoral; y si el esposo traslada su domicilio a otro estado y ella permanece en este estado, el ejercicio de todos sus derechos que dependen del domicilio quedaría igualmente afectado. Esta no puede ser la ley. Por el contrario, la buena lógica nos lleva a concluir que una esposa no puede ser privada del derecho del sufragio ni de ningún derecho civil o legal por las actuaciones de su consorte; y entendemos que ésa es la ley. Cuando sea necesario o apropiado para la esposa adquirir un domicilio distinto, ella puede adquirirlo.''

Por ejemplo, si el primer requisito del artículo 158 debe interpretarse al pie de la letra y seguido ciegamente y puesto en vigor en forma de todo punto estricta, las mujeres casadas en Puerto Rico en las próximas elecciones, de ser instruídas por sus esposos respecto a la forma en que deben emitir sus votos, deben obedecer a sus maridos y votar en la forma que se les ordene.

Los tres artículos en conjunto se basan en la misma idea de unidad en la relación conyugal que sirvió de cimiento a la ficción del derecho común relativa al domicilio implícito. Interpretados en armonía con el artículo 11 del Código Político, estos artículos nada establecen fuera del domicilio presuntivo allí definido como de la esposa. La regla general así prescrita está sujeta a las mismas excepciones y limitaciones que la ficción del derecho común. La presunción debe permanecer en pie, o caer, de acuerdo con las circunstancias, al ser puesta a prueba por la regla que se extiende cual hebra de oro a través de cien años de jurisprudencia americana.

Los derechos y deberes de ambos cónyuges son correlativos y recíprocos. El marido que exige que su mujer lo siga doquiera él fije su residencia, debe suministrarle un sitio adecuado para vivir. Debe estar preparado para ''sa-

tisfacer sus necesidades en proporción a su condición y medios de fortuna." Debe invitarla a que lo acompañe, o, por lo menos, a que se una a él en su nueva morada. La ley no exige que la esposa siga al marido sin invitación previa y sin que medie razón alguna para que ella crea que será bien acogida.

En el presente caso la esposa, desde el día de su matrimonio, ha contribuído al fondo común de la sociedad de gananciales con su salario como maestra de instrucción pública. Nada hay que demuestre que ella hubiese tenido la oportunidad de contribuir en esta forma o en alguna otra a su sostenimiento y al de su hija, en Culebra. Nada hay que demuestre que el esposo estaba en mejores condiciones o más dispuesto a mantener a su esposa e hija en Culebra que en Rincón. Nada hay que demuestre que él estuviera dispuesto a suministrarles los gastos de viaje desde Rincón a Culebra. Nada hay que demuestre que él deseaba que ellas se unieran a él en Culebra. Por el contrario, aparece que la esposa, al ser notificada con el emplazamiento en el caso de divorcio, estaba obedeciendo a su marido, cumpliendo con los deseos de él de que ella terminara el año escolar en Rincón. Ella no podía continuar acatando a su esposo en esa forma y al mismo tiempo siguiéndolo contra la voluntad de él hasta Culebra. Ella no tenía obligación legal o moral de renunciar su empleo y, cual can que no será echado de las colinas del amo que se aleja, seguir a su esposo desde un confín a otro de esta Isla, y de allí cruzar un brazo de mar hasta un faro situado en aquella "estrecha faja de terreno rodeada por el mar" (asumiendo, con licencia poética, la existencia de terreno allí) llamada Culebra.

Es ley familiar, según se expresa en 19 C. J. págs. 418, 419, sección 39, que:

"El domicilio de un soldado o marino que está en el servicio militar o naval de su país, generalmente permanece sin alterar, no ganándose ni perdiéndose el domicilio por el hecho de estar destacado temporalmente en cumplimiento de sus deberes, en determinado sitio,

aun durante un período de años. Sin embargo, puede adquirirse un nuevo domicilio si concurren tanto la acción como la intención.''

Se ha dicho que la misma regla es aplicable al servicio del gobierno en general. 9 R.C.L. 551, sección 14; *Lankford v. Gebhard,* 130 Mo. 621, 32 S. W. 1127.

La razón de ser de la regla (19 C. J. 418, 419, sec. 39, nota 95 (*a*)) es que:

''A fin de adquirir una residencia de hecho o de derecho necesariamente tiene que estar envuelto por lo menos el ejercicio de la voluntad al escogerla, y no puede afirmarse esto con respecto a la residencia de un soldado o marino en servicio activo.''

En el caso de autos, nada hay que demuestre que el traslado fué involuntario, o solicitado por el empleado del gobierno. De haber sido voluntario, fué un mero acto, sin prueba alguna de la intención requerida expresamente por el inciso 7 del artículo 11 del Código Político. Si fué involuntario, el caso cae dentro del razonamiento de la regla relativa a soldados y marinos, y, a fortiori, no hubo cambio de domicilio.

*Debe revocarse la resolución apelada.*

Los Jueces Asociados Señores Wolf y Aldrey están conformes con el resultado.